QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kevin P.B. Johnson (Bar No. 177129)
  kevinjohnson@quinnemanuel.com
  Todd M. Briggs (Bar No. 209282)
  toddbriggs@quinnemanuel.com
  Andrew Bramhall (Bar No. 253115)
  andrewbramhall@quinnemanuel.com
  Brett Arnold (Bar No. 266740)
  brettarnold@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TESSELL, INC. a Delaware Corporation, BALA KUCHIBHOTLA, KAMALDEEP KHANUJA, and BAKUL BANTHIA, Individuals.<br><br>Plaintiffs,<br><br>vs.<br><br>NUTANIX, INC., a Delaware Corporation, RAJIV RAMASWAMI, and TYLER WALL, Individuals<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**CLAIMS FOR RELIEF:**<br>1. **DEFAMATION**<br>2. **TRADE LIBEL**<br>3. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>4. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>5. **FALSE ADVERTISING (FEDERAL)**<br>6. **FALSE ADVERTISING (STATE)**<br>7. **UNFAIR COMPETITION**<br>8. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>9. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Tessell, Inc. ("Tessell"), Bala Kuchibhotla ("Kuchibhotla"), Kamaldeep Khanuja ("Khanuja"), and Bakul Banthia ("Banthia") (collectively, "Plaintiffs") complain and allege against Nutanix, Inc. ("Nutanix"), Rajiv Ramaswami ("Ramaswami"), and Tyler Wall ("Wall") (collectively "Defendants") as follows:

## INTRODUCTION

1. Tessell was founded in March 2021 to revolutionize the cloud database management space. At that time, legacy database management products, like those at Nutanix, had focused primarily on physical, on-premises database storage and private database hosting and relied on programs that created a large middle layer of hardware and software between a business and its disparate database systems. With decades of experience in the industry and since at least 2013, Bala Kuchibhotla had a vision for a new solution that was cloud native, taking advantage of the new opportunities springing up from the rise of public cloud services like Amazon Web Services (AWS), Microsoft Azure, and Google Cloud.

2. Mr. Kuchibhotla started working at Nutanix in 2017 with a promise from Nutanix leadership that he would be given the opportunity to act as an entrepreneur at Nutanix, and would have the ability to develop and lead his own business unit. However, Nutanix never followed through with the necessary resources or support, and in early 2021 Nutanix's new CEO Rajiv Ramaswami ultimately denied him the promised opportunity.

3. Realizing that his longstanding vision would never come to fruition unless he set out on his own, Mr. Kuchibhotla, along with engineers Kamal Khanuja and Bakul Banthia, took the risk of leaving their jobs and creating a startup, building Tessell and its products from the ground up. Tessell began in a garage with a white board and a vision, and after a year and a half, including many thousands of hours of engineering work and millions of dollars spent on R&D, Tessell had developed a new database management platform for cloud native database users.

4. Tessell's groundbreaking web-based Database-as-a-Service ("DBaaS") platform dramatically simplifies and reduces the cost of creating, managing, and modernizing databases in the public cloud. Tessell's platform is multi-tenant, meaning a single instance of the software and its underlying infrastructure securely serves multiple customers, while offering them maximum

flexibility—including the ability to deploy on the public cloud of their choice (for example, Amazon's AWS, Microsoft's Azure, Google Cloud, or Oracle's OCI) and use their preferred database engine (such as Oracle, SQL Server, PostgreSQL, and MongoDB). To support this flexibility, Tessell developed new control plane architectures capable of orchestrating its multi-tenant environment through a unified and seamless experience. It also engineered novel microservices architectures and software components that efficiently and independently invoke the platform's various services and features at scale. To enable deployment across multiple clouds and ensure cohesive, enterprise-grade performance, Tessell built containerized Kubernetes clusters, introduced new APIs and communication protocols, and created robust frameworks for exception handling and error management.

5. Tessell's modern, cloud-native service is dramatically different from any product ever sold by Nutanix. Nutanix has nevertheless attempted, without success, to replicate Tessell's groundbreaking technology as part of a program Nutanix refers to as "Project Beacon." In 2021, following the departure of Tessell's founders, Nutanix hired former AWS product leader Tobias Ternström to tackle what Nutanix described as the "really tricky" challenge of developing a cloud-native database platform comparable to Tessell's.[1] Between October 2022 and February 2023, Nutanix hired three of Tessell's key engineers and, on information and belief, assigned them to work on Project Beacon. At Nutanix's .NEXT 2023 conference, Mr. Ternström joined CEO Rajiv Ramaswami on stage to publicly unveil Project Beacon as Nutanix's "vision for the future," in which customers would be able to run Nutanix Database Service "natively in public cloud."[2] However, less than a year later, Mr. Ternström departed Nutanix without realizing that vision. Nutanix has yet to achieve its goal of offering its Nutanix Database Service natively in the public

[1]  *See* Nutanix.com, "Bringing Order to Database Ecosystems" (Oct. 6, 2022), https://www.nutanix.com/theforecastbynutanix/profile/tobias-ternstrom-on-cloud-database-management ("Combining on-premises data centers with public clouds from a raft of providers is difficult enough. Toss databases into the mix and things get really tricky. This is where Ternström steps in to help.").
[2]  *See* Nutanix.com, "Embracing the Future of Hybrid Multicloud at .NEXT" (May 18, 2023), https://www.nutanix.com/blog/embracing-the-future-of-hybrid-multicloud-at-next.

cloud, but on information and belief, it continues to pursue this objective in its ongoing attempt to catch up to Tessell's technology.[3]

6.      In March 2024, after the departure of Mr. Ternström from Nutanix and more than a year after the launch of Tessell's innovative product, Tessell and its leaders found themselves falsely accused by Nutanix and its leaders of having stolen everything they had painstakingly built at Tessell.  Instead of reaching out to Tessell and its founders to discuss the serious accusations it was about to make, Nutanix initiated a surprise smear campaign against them.  On March 20, 2024, Nutanix publicly posted a hit-piece in the form of a so-called "press release" on its website falsely accusing Tessell and each of its founders of serious, criminal wrongdoing, including the "unfettered theft" of Nutanix's "intellectual property and source code."  That same day, Nutanix's "press release" was also disseminated through BusinessWire.com, a paid service helping companies broadly spread their news, after which it was picked up by various online news publications, including popular financial news and investing sites.  Since that time, Tessell and its founders have continuously been targeted by that public smear campaign, which brazenly demands they hand over everything they had labored to create to a former employer that had refused to deliver on its promises.

7.      Ever since this time, Tessell and its founders have been substantially hindered in their efforts to raise funding from investors and to gain trust among prospective customers because of the knowing and reckless falsehoods that Nutanix has continued to disseminate and refused to correct to this very day.  On information and belief, Tessell understands that Nutanix representatives, including its CEO Rajiv Ramaswami and other leadership have continuously repeated and spread the same knowing falsehoods, including to potential Tessell investors and customers.

---

[3]   The product called "Nutanix Database Service" or "NDB" was previously called "Nutanix Era," including at the time that the Plaintiffs worked at Nutanix.  It was renamed in May 2022 upon the release of version 2.4 of the product.  *See* Nutanix.com, "Boost your Database Operations with Nutanix Database Service 2.4" (May 2, 2022), https://www.nutanix.com/blog/nutanix-database-service-2-4.

8.    There can be no doubt in Defendants' minds that Mr. Kuchibhotla, Mr. Khanuja, and Mr. Banthia did not steal Nutanix's source code and use it in Tessell's product.  Tessell has made its code available for over a year for inspection and review by Nutanix who has failed to come forward with any evidence that Mr. Kuchibhotla, Mr. Khanuja, or Mr. Banthia stole any Nutanix source code much less used it in Tessell's product.  Nevertheless, despite this damning proof, Nutanix obstinately continues to spread falsehoods alleging the opposite, not only in litigation with Tessell and its founders, but on its public website and communications in the marketplace.

9.    Entrepreneurship and innovation are the lifeblood of Silicon Valley and are a key part of what makes working in California attractive to the world's talent; what the Tessell founders have lawfully done should be celebrated not attacked.  This lawsuit seeks to end Nutanix's illegal and harmful conduct and to allow Tessell and its founders to conduct their business on a level playing field, rather than one unfairly and improperly tilted in Nutanix's favor.

10.    Despite Nutanix's malicious campaign and the customers and investors Tessell has unfairly lost as a result, Tessell's cloud-native platform continues to deliver superior value and innovation.  Tessell and its founders remain steadfast in their commitment to their customers and investors and the integrity of their technology, which Nutanix itself has recognized as difficult to make and truly groundbreaking.

## NATURE OF THE DISPUTE

11.    On March 20, 2024, Nutanix filed a civil lawsuit in federal court against Tessell in an attempt to derail the innovative startup whose cloud-native service is significantly different from, and in multiple ways superior to, Nutanix's older on-premises technology.  Nutanix's complaint made various allegations against Tessell's founders, namely that they each retained Nutanix Era source code and used it in building Tessell's products.  Importantly, Nutanix's lawsuit of March 20 alleged only civil liability related to copyright infringement, patent infringement, and tortious interference with contractual relations.  An arbitration proceeding started that same day against the three founders alleged only civil claims for breach of contract, copyright infringement, and trade secret misappropriation.

12. Nutanix's allegations against Tessell and its founders were false. Notably, Tessell's founders did not steal Nutanix source code or intellectual property nor did they invent or develop Tessell's groundbreaking cloud-native DBaaS technology while employed at Nutanix. Quite the opposite, Tessell developed its platform independently, beginning with brainstorming on a whiteboard in Mr. Kuchibhotla's garage after leaving Nutanix based on ideas Mr. Kuchibhotla had long before joining Nutanix, followed by a massive development effort using Tessell and its founders' own resources.

13. After Nutanix filed its complaint, it could and should have limited the litigation of its unproven civil allegations to the judicial process where Tessell and its founders have the rights and protections afforded them in that framework, including discovery, cross-examination, and a requirement for competent evidence rather than conjecture, sensationalism, and speculation. On information and belief, the animus behind Nutanix's actions, however, was not to seek the truth or right any wrong. Rather, it was to cause serious personal, reputational, occupational, business, and financial harm to Tessell and its founders and to take for its own what Tessell had created.

14. Nutanix chose to "litigate" its attacks on Tessell and its founders not just in the courtroom, but in the public sphere as well. On the same day it filed its civil federal complaint against Tessell, Nutanix published a so-called "press release" on its website in which it purported to summarize the false accusations it had made against Tessell and its founders in the civil lawsuit. The "press release" deliberately went well beyond that, however, and falsely accused Tessell and its founders of *criminal* activity, using sensationalist quotes and language evoking criminal trade secret theft.

15. The libel started with the title of the post: "Nutanix Files Theft of Intellectual Property Lawsuit against Tessell, Inc." No such lawsuit had been filed. There was only a civil lawsuit for copyright infringement, patent infringement, and tortious interference with contract against Tessell. Nutanix did not file, nor could it have filed, a lawsuit under any criminal statute, and no such lawsuit by the state exists. Undeterred, the Nutanix "press release" went on to falsely and libelously accuse Tessell and its founders of criminal conduct, describing supposed "theft of Nutanix's source code and intellectual property," including more false allegations that they

"covertly designed, built, demonstrated, and secured financing for the future Tessell product" while at Nutanix, "schemed to remove all indicia of Nutanix branding from their prototype, and then tried to cover their tracks by wiping their Nutanix laptops." The "press release" referred further to so-called "facts" about "unfettered theft of [Nutanix's] intellectual property and source code" that were supposedly "too nefarious to ignore."

16. The "press release" also improperly sought to substantiate these unverified and false criminal accusations through the imprimatur of an officer of the court, Nutanix's then-Chief Legal Officer Tyler Wall, who referred to "facts" that were supposedly uncovered in an internal "investigation," again deceitfully and harmfully evoking the language of criminal conduct where nothing at all of that kind had occurred. Wall is quoted as saying that it was supposedly "shocking" to him "to learn of the behavior of these former employees during their employment, the scope of what they took from Nutanix, and the steps they took to hide their use of Nutanix resources to found their company." He then referred to a supposed "investigation" Nutanix conducted and said that the "facts" uncovered by it were "egregious." The "press release" was a publicity stunt, plainly designed to maliciously disparage and harm Tessell and its founders by accusing them of criminal conduct by using the civil lawsuit as a pretext. Put simply, the "press release" went far beyond the civil complaint and its allegations to smear Tessell and its founders with highly damaging and false statements painting them each—falsely—as thieves and criminals.

17. To this day, however, Nutanix has repeatedly refused to reveal anything about its purported "investigation" other than a few cherry-picked and self-serving "facts" that were supposedly discovered. The handful of conclusions that Nutanix drew from its supposed investigation are grossly distorted, knowingly out-of-context, and libelous. Nutanix refuses to disclose, for example, who was involved in the investigation, how long it took, what procedures were used, what devices were analyzed, what efforts—if any—were taken to ensure it sought the truth rather than the basis for a tactical lawsuit, or even what reports were created or conclusions were drawn. There is no good faith reason Nutanix could be so adamant about hiding the true history and circumstances of the so-called investigation while at the same time invoking it in its false online advertisement and relying on a few self-serving conclusions that supposedly came out

COMPLAINT AND DEMAND FOR JURY TRIAL

of it.  Either the investigation was recklessly deficient or it was designed from the start to manufacture a lawsuit—neither is proper.

18.    Nutanix did not just post the "press release" on its own website.  On March 20, 2024, the same day as the lawsuits were filed, the "press release" was conveniently picked up and publicly disseminated by BusinessWire.com, a paid service designed to broadcast company media and news releases so that they reach "major media outlets, trade press, and industry leaders, providing extensive coverage and opportunities for engagement."[4]    Nutanix's post on BusinessWire, which it almost certainly paid to place there, is still live to this day,[5] and has for almost two years included contact information for Nutanix's Vice President of Corporate Communications and Vice President of Investor Relations so that readers have an immediate "Media Contact" and "Investor Contact" to reach about the libelous post.

19.    The Defendants' strategy was successful.  Starting within hours and continuing over the following days, online publications, including Yahoo Finance and Investing.com, began repeating the libelous content, directly quoting the Nutanix press release and Tyler Wall's slanderous statements.[6]

20.    For almost two years, Nutanix has brazenly and publicly posted its libelous advertisement on its website (and, on information and belief, through other means as well), claiming to the world, including through quotes from an officer of the court, that a forensic

---

[4]   *See* BusinessWire.com, https://www.businesswire.com/services/distribution ("Business Wire doesn't just distribute press releases; we deliver fully branded, actionable news to engaged audiences worldwide.  Our multichannel system ensures your consumer-facing and investor relations news reaches major media outlets, trade press, and industry leaders, providing extensive coverage and opportunities for engagement.")

[5]   https://www.businesswire.com/news/home/20240320090560/en/Nutanix-Files-Theft-of-Intellectual-Property-Lawsuit-Against-Tessell-Inc.

[6]   *See, e.g.*, Investing.com, "Nutanix sues Tessell for alleged IP theft" (Mar. 20, 2024), https://www.investing.com/news/stock-market-news/nutanix-sues-tessell-for-alleged-ip-theft-93CH-3346857; ChannelFutures.com, "Nutanix Lawsuit: 'Shocking' Behavior by Tessell Founders" (Mar. 21, 2024), https://www.channelfutures.com/regulation-compliance/nutanix-lawsuit-shocking-behavior-tessell; TheRegister.com, "Nutanix Alleges IP Theft by DBaas Startup Tessell" (Mar. 21, 2024) https://www.theregister.com/2024/03/21/nutanix_tessell_lawsuit/ (linking to Yahoo Finance at https://finance.yahoo.com/news/nutanix-files-theft-intellectual-property-203700400.html for the Nutanix press release and the Tyler Wall quotes).

COMPLAINT AND DEMAND FOR JURY TRIAL

investigation revealed supposedly "shocking" and "egregious" acts by Tessell's founders of "unfettered theft" of Nutanix's "intellectual property and source code." None of this has any basis in the truth.

21. To make matters worse, Tessell and its founders understand on information and belief that Nutanix representatives, including its CEO Rajiv Ramaswami and other leadership have repeated and spread the same defamatory statements that were published on Nutanix's website. Tessell and its founders understand that these harmful statements have been made to various third parties, including to potential and current Tessell investors and customers to drive them away from the company. Nutanix's efforts have had their intended effect, and Tessell has been damaged as a result, both reputationally and financially.

22. Nutanix, including its officers and directors, did not have any legal right or privilege to publicly slander Tessell and its founders or to unfairly compete against them through a continuously running public advertisement posted under the disingenuous title of a "press release." Nutanix is not the press, nor was its statement communicated to the press, it was a voluntary act of unprivileged libel deliberately designed to harm Tessell and its founders. Nor did Nutanix, including its officers and directors, have any legal right or privilege to conduct their broader smear campaign against Tessell and its founders, who have suffered greatly, both personally and professionally, from Nutanix's actions.

23. Through this lawsuit, Tessell and its founders seek to put an end to the harm Nutanix has caused and continues to cause through its public smear campaign and its defamatory statements to prospective investors and customers.

**PARTIES**

24. Tessell, Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 2603 Camino Ramon, Suite 340, San Ramon, California 94583.

25. Balasubrahmanyam "Bala" Kuchibhotla is an individual residing in this District.

26. Kamaldeep "Kamal" Khanuja is an individual residing in this State.

27. Bakul Banthia is an individual residing in this District.

28. Nutanix, Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 1740 Technology Drive, Suite 150, San Jose, California 95110.

29. Rajiv Ramaswami is an individual residing in this District.

30. Tyler Wall is an individual who resided in this District at the time of the facts underlying the claims herein, and on information and belief is still a resident of California and this District and/or maintains ties sufficient to be subject to personal jurisdiction in this State and District.

**JURISDICTION AND VENUE**

31. This Court has personal jurisdiction over the Defendants at least because they are domiciled in this District and have continuous and systematic contacts with California and this District that render them essentially at home here. The Court also has personal jurisdiction because a substantial portion of the actions and omissions alleged herein occurred within this District, the Defendants purposefully directed their activities toward this District, and the Defendants purposefully availed themselves of the privilege of conducting business within this State and District. The Defendants also knew that the individual Plaintiffs lived in this District and that Tessell's principal place of business is in this District. The Defendants intentionally published false statements in this District and aimed those statements at individuals and entities located in this District. Defendants also knew that the effects of and harm from their conduct would be felt by Plaintiffs primarily in this District.

32. This Court has subject matter jurisdiction under at least the following statutes: 15 U.S.C. § 1121 (action arising under the Lanham Act); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1367 (supplemental jurisdiction).

33. Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants are subject to this Court's jurisdiction and a substantial part of the events or omissions giving rise to the claims and affecting interstate commerce occurred in this judicial District.

COMPLAINT AND DEMAND FOR JURY TRIAL

**FACTUAL ALLEGATIONS**

**Tessell's Cloud-Native Database Management Service**

34.    Virtually all modern enterprises of any size require databases, whether to record customer transactions, track inventory, store employment records, or manage other critical business information.  Through groundbreaking innovation and many thousands of hours of engineering work conducted after leaving Nutanix in 2021, Tessell's co-founders—Bala Kuchibhotla, Kamal Khanuja, and Bakul Banthia—led the development of a web-based database-as-a-service ("DBaaS") business that dramatically simplifies and reduces the cost of creating, managing, and modernizing databases in the public cloud on platforms like AWS, Microsoft Azure, and Google Cloud.

35.    Customers who subscribe to Tessell's platform pay only for what they use, and Tessell subscribers can quickly, easily, and securely create and manage many different types of databases on different public-cloud platforms in a wide variety of configurations.  Moreover, Tessell's patented technology allows customers to run their databases at a fraction of the cost of public-cloud services like Relational Database Service (on AWS) and CloudSQL (on Google Cloud), while enjoying all of the benefits of cloud computing, such as utility consumption model pricing, elastic resource management, and integration with other cloud-native services.

36.    Tessell's data planes run inside the customer's own cloud accounts so that data never leaves their environment, addressing sovereignty, compliance, and governance concerns. Tessell's service can be deployed on any cloud, any region (dedicated or shared), and is completely private for customers with stringent security requirements.  All of this is wrapped in a Netflix-like subscription delivery model, making a complex enterprise database infrastructure feel as simple as a streaming service.

37.    Said another way, Tessell's service is like purchasing electricity from a local electric company like PG&E where customers pay only for the electricity they use and do not have to build and maintain their own power generation facilities or the infrastructure required to deliver that generated electricity to individual businesses and homes.  With Tessell, every separate aspect

COMPLAINT AND DEMAND FOR JURY TRIAL

of interacting with the database (such as delivery, consumption, monitoring, maintenance, and billing) is managed by Tessell for a fully streamlined experience.

38.     Compare this to Nutanix Era (now called "Nutanix Database Service" or "NDB"), which is essentially a monolithic program packaged as a single virtual machine running on Nutanix's proprietary operating system, AOS (Acropolis Operating System).  Instead of a modern distributed service architecture, Era relies on this single VM-based application to perform database lifecycle management within the Nutanix environment.  To use this product, each customer must install, maintain, and operate the product itself to enjoy the limited database lifecycle-management functionality it provides, akin to buying a car and then being responsible for operating and maintaining it oneself, while being limited to the benefits provided by the car's specific make, model, and physical location.

39.     Tessell's platform is its own, and the underlying technology stems not only from the years of innovative development of the Tessell team after Tessell was formed but also from the DBaaS concept that Mr. Kuchibhotla possessed and was interested in long before he joined Nutanix.  That, however, has not stopped Nutanix from an expansive and improper land grab to take what does not belong to it.

**Mr. Kuchibhotla's Longstanding Vision for a Cloud-Native Database Management Service**

40.     Tessell's path to building a cloud-native database service did not begin at Nutanix, as Nutanix well knows, but more than a decade earlier.  Tessell is the brainchild of Mr. Kuchibhotla who conceived of its underlying concept years before he joined Nutanix.  As a Vice President at Oracle in charge of database services, Mr. Kuchibhotla saw early on the trend toward cloud-based databases in contrast to the then-dominant use of physical, on-premises database storage systems.  With the rise of AWS, more and more companies began to move their computing needs, including database storage, to the cloud.  Mr. Kuchibhotla envisioned a software service that could help companies manage their database needs in this new pure-cloud environment.

41.     Mr. Kuchibhotla's vision for a cloud-native database platform drew inspiration from Amazon's Relational Database Service ("RDS"), which dates back to 2009 and is a web service

-11-
COMPLAINT AND DEMAND FOR JURY TRIAL

that allows users to set up, operate, and scale relational databases in the AWS Cloud. After learning about RDS and how it functioned, Mr. Kuchibhotla envisioned ways for improving it and other cloud-based database services.

42. In late 2016 and early 2017, prior to joining Nutanix, Mr. Kuchibhotla presented his general ideas and concepts to Nutanix executives, including Nutanix founder and then-CEO Dheeraj Pandey ("Pandey"). For example, in December 2016, Mr. Kuchibhotla emailed Mr. Pandey describing several major ideas he had that could be explored at Nutanix, including a DBaaS platform that he described as RDS++. In January 2017, Mr. Kuchibhotla wrote to Mr. Pandey again about taking Nutanix in the direction of a cloud-based subscription model. During the first week of January 2017, Mr. Kuchibhotla did a demonstration at Nutanix headquarters for Mr. Pandey and others, including other executives, where Mr. Kuchibhotla demonstrated RDS-like database provisioning and cloning on AWS, a public cloud.

43. Emails like these were accompanied by conversations with Mr. Pandey about Mr. Kuchibhotla's vision for a cloud-native offering, moving away from an on-premises, proprietary operating system model. Based on these conversations, Mr. Kuchibhotla signed an offer of employment with Nutanix on January 18, 2017. After leaving Oracle, Mr. Kuchibhotla started working at Nutanix on February 21, 2017.

**Nutanix's New Leadership Fails To Fulfill The Promises Made To Mr. Kuchibhotla**

44. Mr. Kuchibhotla began his work at Nutanix with the express understanding that he would be given the opportunity to act as an entrepreneur at Nutanix and would have the ability to lead his own spin-out business unit. When he joined Nutanix, however, Mr. Pandey asked Mr. Kuchibhotla to first develop a different product within Nutanix's existing business structure. Mr. Kuchibhotla diligently and loyally took on this project with the understanding that he would still be given the opportunity in the future to run his own spin-out business unit. At Mr. Pandey's request, Mr. Kuchibhotla assembled a team to develop this new product which later came to be known as Nutanix Era.

45. The Nutanix Era product was not a cloud-native database service, like the one Mr. Kuchibhotla had conceived of prior to joining Nutanix. Instead, Era was built around a

different model of database management known as hyperconverged infrastructure, which was deployed on-premises rather than in the public cloud. Nutanix's hyperconverged infrastructure was tightly coupled to physical hardware, running on dedicated nodes (called "Nutanix Clusters") that an organization using Era had to procure, install, and maintain. Rather than being built from independently deployable microservices, Era relied on a monolithic design. The software was essentially delivered as a single program running inside one virtual machine on Nutanix's proprietary Acropolis Operating System. In this tightly coupled hyperconverged setup, compute, storage, and networking were bundled together and managed as a single stack on Nutanix Clusters, with Era functioning as a VM-based application layered on top to perform database lifecycle management. This monolithic architecture meant that Era was typically deployed as a single-tenant platform where Nutanix Clusters had to be dedicated to a single organization, rather than a multi-tenant architecture that could allow multiple external customers to operate on a shared infrastructure.

46. The success of the Nutanix Era product was in large part the result of the tireless and dedicated work Mr. Kuchibhotla performed in engaging important customers and leading the team of hundreds of engineers, which included Mr. Khanuja and Mr. Banthia, whose strong engineering efforts redounded to the continual benefit of Nutanix.

47. While faithfully leading Nutanix's efforts with Nutanix Era, Mr. Kuchibhotla never gave up on his dream to act as an entrepreneur at Nutanix and lead his own business unit. Following the successful commercial launch of Nutanix Era, Mr. Kuchibhotla saw an opportunity to develop a new product based on Nutanix Era that would be implemented on the public cloud as opposed to the on-premises approach that was employed by the version of Nutanix's Era product that existed at the time. Mr. Kuchibhotla also saw this as an ideal opportunity to finally lead his own spin-out business unit at Nutanix.

48. By mid-2020, Mr. Kuchibhotla had proposed this vision for a new business unit to Nutanix's CEO, Mr. Pandey. Mr. Kuchibhotla also regularly discussed this vision with his manager, Tarkan Maner, who had joined Nutanix in November 2019 as its Chief Commercial

Officer.  Mr. Maner was highly encouraging of Mr. Kuchibhotla's vision, and throughout his time at Nutanix, Mr. Maner championed Mr. Kuchibhotla to Nutanix's leaders, including to its CEOs.

49.    In August 2020, Mr. Pandey announced that he was leaving Nutanix to work on a new venture.  Mr. Kuchibhotla nevertheless continued communicating his vision for a new business unit to other Nutanix officers and directors.  For example, he reiterated to a financial officer of Nutanix, that while he had originally approached Nutanix to get funding for a startup that would focus on a cloud-native database product, he had agreed to work directly for Nutanix with the expectation that Nutanix would in the future provide the resources he would need to lead a business unit.  With Mr. Pandey's departure, Mr. Kuchibhotla had concerns about the plan coming to fruition, which he expressed to the financial officer.

50.    In December 2020, Rajiv Ramaswami began as the new CEO of Nutanix. Mr. Kuchibhotla immediately welcomed him and began to communicate his vision for a new business unit to Mr. Ramaswami, trying once again to get the resources and commitment needed to expand Era to be used in conjunction with the public cloud.  Mr. Kuchibhotla made clear to Mr. Ramaswami that his vision could help meaningfully increase revenue from the Era product over the following five years.

51.    Mr. Kuchibhotla envisioned being able to get Nutanix Era to be compatible with a cloud-native offering, but only if Nutanix were willing to devote the resources and engineers. Between December 2020 and February 2021, Mr. Kuchibhotla had numerous conversations with senior executives at Nutanix, including Mr. Maner and Mr. Ramaswami, about how this could be done within Nutanix as a so-called start-up within an enterprise, or as a spin-out business unit. Indeed, far from being kept in the dark about Mr. Kuchibhotla's ideas, Mr. Ramaswami was included in the conversation from day one.  Mr. Ramaswami asked specific and pointed questions to Mr. Kuchibhotla about the potential for the project to determine whether it would be possible to extend the current Era product to non-Nutanix platforms including on top of public cloud vendors.  Mr. Kuchibhotla explained that he believed it certainly was but that there would be a great deal of work to do to make it a reality.

52. From mid-December through mid-January, Mr. Kuchibhotla continued to develop and advocate for the new business model, speaking openly about it with Nutanix's leaders and Nutanix's investors. Based on these initial conversations, Mr. Ramaswami invited Mr. Kuchibhotla to his own house to discuss the plan on Sunday, January 17, 2021. In their communications prior to and at the meeting, Mr. Kuchibhotla explained in detail the opportunity he saw for the future of the Era product if Nutanix would enable him to enact his plan for a new business unit. In the days following the meeting at Mr. Ramaswami's house, Mr. Kuchibhotla followed up with even more information for Mr. Ramaswami, explaining that the vision would need to be a new startup-like business with a headcount in the hundreds, including new engineers, salespeople, and marketing staff, independent of what Era currently had. Mr. Kuchibhotla proposed a startup-like equity structure, with Nutanix owning a majority stake in the business and Mr. Kuchibhotla having access to equity to distribute to employees within the business. Mr. Kuchibhotla was willing to take a significantly reduced salary and accept much less equity than he would have had if he started his own company.

53. Over the next month, Mr. Kuchibhotla continued to communicate his ideas directly with Mr. Ramaswami. Mr. Kuchibhotla sent Mr. Ramaswami a roadmap showing that to do the work in conjunction with Nutanix would be a multi-year project, with the portion of the project aimed at public cloud vendors taking about 18 months.

54. Throughout this time, and at the direction of Nutanix's leadership, Mr. Kuchibhotla continued consulting with one of Nutanix's investment firms to develop the proposed business model for expanding the Era business. These conversations, as well as those with Nutanix leadership, led Mr. Kuchibhotla to believe that staying at Nutanix would still allow him to run his own business unit and develop Era further.

55. Around this same time, Mr. Kuchibhotla also began meeting with potential investors at the introduction and behest of Mr. Maner. Mr. Maner saw the potential in Mr. Kuchibhotla as a leader and technology developer, and personally introduced Mr. Kuchibhotla to some of Silicon Valley's leading technology executives and angel investors. On information and belief, Mr. Maner knew at least by the beginning of 2021 that Nutanix was not going to support

COMPLAINT AND DEMAND FOR JURY TRIAL

Mr. Kuchibhotla in starting a spinoff business unit within the company and Mr. Maner sought to pave the way for Mr. Kuchibhotla to get funding for a new venture if he were to leave Nutanix and create a new startup.

56.    Mr. Kuchibhotla, Mr. Khanuja, and Mr. Banthia, continuing to work toward the idea of a spin-off business unit affiliated with Nutanix, created a mockup of what the outward-facing UI could look like for the new product.  The mockup was exactly that—an incomplete, surface-level facade, not a working "prototype" as Nutanix has wrongly alleged.  At that time, the three were aiming to get funding from Nutanix and outside investors so that they could begin the work of creating a new product inside a spin-off business unit at Nutanix, which they envisioned would require a dedicated team of hundreds of people, including engineers and salespeople, working for several years.  The UI mockup from the beginning of 2021 was just the very first stage of an idea and was shown to Nutanix management and board members.  It was not a hidden project in any possible way nor was it new code, much less new code for a future, independent product.

57.    Mr. Kuchibhotla was looking for a solution that would be a win-win for Nutanix as well as him and his team, but he was never given the greenlight as he had been promised.  By March of 2021, it became clear through continued conversations with Mr. Ramaswami and other Nutanix executives that Nutanix was unwilling to create a spin-out arrangement for Mr. Kuchibhotla's business unit.  Instead, Mr. Ramaswami wanted Mr. Kuchibhotla and his team to remain in their same roles within the company and work on the next iteration of the legacy Nutanix Era system.  Mr. Kuchibhotla recognized that he would have to take the risk of going out on his own to realize his longstanding entrepreneurial ambitions.

58.    In March 2021, Mr. Kuchibhotla and Mr. Khanuja left Nutanix and began working from scratch on what would become Tessell's new service.  In the following months, Mr. Maner, still in the position of Nutanix's CCO, continued to support Mr. Kuchibhotla's efforts, even pledging to invest in the new venture himself, writing a check for $1 million.  Mr. Maner continued to facilitate meetings with investors to help get the Tessell venture off the ground.  Mr. Pandey, Nutanix's co-founder, board member, and former CEO, also knew about the startup and invested in it, as did another former officer of Nutanix.

COMPLAINT AND DEMAND FOR JURY TRIAL

59.    In May 2021, Mr. Banthia joined Mr. Kuchibhotla and Mr. Khanuja at Tessell.

**Mr. Kuchibhotla and Team Develop New Technology at Tessell**

60.    Although Mr. Kuchibhotla, Mr. Khanuja, and Mr. Banthia retained the name "Tessell" that Mr. Kuchibhotla had come up with, the platform they built was novel and innovative. Having left Nutanix and the idea of a separate Nutanix Era business unit behind, the Tessell founders were no longer tethered to developing the next generation of the Nutanix Era product and could build something entirely new that was truly cloud-native. Nutanix had nothing like it at the time (nor even now). Indeed, Nutanix Era's single-tenant, monolithic, on-premises architecture and tightly integrated software stack was, and is, fundamentally different than the service Tessell's founders set out to design once they had left Nutanix: a multi-tenant, microservices-based, cloud-native DBaaS platform. As Nutanix itself recognized (more than a year after Tessell's founders left), what Tessell was looking to build was "difficult" and "really tricky."[7] Thus, Tessell had to build its new service from the ground up, with Tessell's engineers teaching themselves about fundamental differences between on-premises and cloud-native architectures.

61.    The Tessell team began this process by working in a garage on a whiteboard, discussing from first principles how they could make a multi-tenant, microservices-based, cloud-native platform for database and data management services.

62.    By April 2021, Tessell was investigating cloud choices for the Tessell infrastructure, control plane strategies, and micro-services architectures. The Tessell team iteratively came up with its initial control plane diagrams showing control flows and services that it planned to use within the control plane. Tessell also came up with a list of micro-services to investigate and established a workspace on Confluence to document its development efforts.

63.    In the months that followed, Mr. Banthia joined the other founders and Tessell continued to investigate and develop different features for its service. For instance, Tessell began

---

[7]    Nutanix.com, "Bringing Order to Database Ecosystems" (Oct. 6, 2022), https://www.nutanix.com/theforecastbynutanix/profile/tobias-ternstrom-on-cloud-database-management.

working on microservices architectures, containerized Kubernetes clusters, frameworks for database provisioning and back-ups, custom APIs and communication protocols, and robust frameworks for exception handling and error management, among other things. Tessell also began investigating additional product features, including, for example, a user-facing functional module for providing applications in Tessell and a clone service for allowing customers to create clones of their database running in Tessell using the Tessell Availability Machine.

64.     By mid-2021, Tessell had collected research on UI design ideas. In early July of that year, Mr. Kuchibhotla suggested to Mr. Banthia that the UX of the Rippling software could provide an inspiration for Tessell's UX. Tessell then hired a UX designer and two UI engineers to independently develop Tessell UI source code using version 4 of the open source Material UI library. In September 2021, Tessell upgraded its UI code to be compatible with version 5 of the Material UI library, which was released the same month. This required a rewriting of Tessell's existing UI code because version 5 contained breaking changes.

65.     In late 2021 and the first half of 2022, Tessell continued to investigate and develop the components and overall architecture of Tessell's infrastructure. And by May of 2022, Tessell had filed patent applications describing methods and systems it had developed for generating snapshots of cloud-based storage systems, including techniques that enabled snapshotting ephemeral storage systems. *See, e.g.*, U.S. Patent No. 11,934,665, U.S. Patent No. 12,135,617.

66.     Tessell's development efforts were a massive undertaking that consumed tens of thousands of hours of engineering work and millions of dollars of R&D, using funds from angel investors, including some of Nutanix's former board members.

67.   By late 2022, the Tessell team had created an entirely new cloud-native database management service that was ready for the marketplace. Tessell released its first offering in late October 2022. The reception they got from consumers was overwhelmingly positive.

### Three Tessell Engineers Leave to Work at Nutanix

68.     Returning back to the beginning of Tessell's development efforts to build a new cloud-native service, Tessell grew its small engineering team and hired three additional engineers

COMPLAINT AND DEMAND FOR JURY TRIAL

in July 2021 to help develop its innovative technology.  These engineers previously worked with Mr. Kuchibhotla, Mr. Khanuja, and Mr. Banthia at Nutanix.

69.    During the tenure of these three employees at Tessell, they worked closely with the small group of engineers that were developing Tessell's service and were entrusted with access to Tessell's source code.  All three worked on key components of the new Tessell service, seeing firsthand the innovative technology that Tessell was building from scratch.  Eventually, between October 2022 and February 2023, these three employees one by one left Tessell to go back to work at Nutanix.  On information and belief, despite being part of the core group of engineers comprising Tessell's software development team and despite having full access to Tessell's source code, none of these engineers were aware of any use or misappropriation of Nutanix source code or unauthorized use of Nutanix information or intellectual property by anyone at Tessell.  Further, on information and belief, none of these engineers raised any red flags or concerns at Nutanix about any supposed use of Nutanix code or intellectual property at Tessell.

70.    Tessell later became aware that at least one of the three former engineers was working on Nutanix's Project Beacon effort.  On information and belief, Project Beacon is Nutanix's attempt to create a service that will compete head-to-head with Tessell's.  For example, in Nutanix's own words, "Project Beacon is a multi-year effort by Nutanix to deliver a portfolio of data-centric Infrastructure-as-a-Service (IaaS) and Platform-as-a-Service (PaaS)-level services available natively anywhere – including on Nutanix and on hyperscaler infrastructure."[8]  Nutanix has further stated that as part of Project Beacon, Nutanix "also plan[s] to deliver Nutanix Database Service™ (NDB) as a fully managed service in the public cloud."[9]

**Nutanix Launches a Defamatory Smear Campaign Against Tessell and its Founders**

71.    Upon the launch of Tessell's new cloud-native service in October 2022, Nutanix, through at least Mr. Ramaswami and Mr. Wall, set out to find a way to derail Tessell's advances. Rather than recognize its own mistakes in failing to support Mr. Kuchibhotla and his vision or to

---

[8]   "Project Beacon", https://www.nutanix.com/projectbeacon.
[9]   *Id.*

devote Nutanix resources years earlier to creating its own cloud-native service, Nutanix set about manufacturing a dispute with its former employees so it could attempt to claim what Tessell had created as stolen property. The "investigation" Nutanix conducted at Mr. Ramaswami and Mr. Wall's request was aimed not at seeking the truth, but at "finding" what Nutanix wanted to find, and wanted the world to believe had occurred, conjuring up allegations of deception and theft. The so-called investigation was deliberately (or at the very least recklessly) deficient.

72. For example, on information and belief, Nutanix personnel never spoke with Mr. Maner, Mr. Kuchibhotla's direct manager at Nutanix, during the pre-suit "investigation" process. Had they done so, Nutanix would have learned the details of Mr. Maner's encouragement of Mr. Kuchibhotla's starting a new venture, as well as his own commitment to invest $1 million in Tessell. A true forensic investigation would have also found that the Tessell founders had not been secretly developing code while working at Nutanix, but were openly trying to get support from Nutanix so that they could begin working on new code for a spin-off business unit to extend the Era product to the public cloud. A true investigation would also have shown Nutanix that the supposed "prototype" that the individual Plaintiffs created within Nutanix as part of this effort in early 2021 with the working name "Tessell" was just a mockup, not a functioning UI.

73. Nevertheless, on March 20, 2024, Nutanix filed its meritless lawsuit against Tessell in district court and initiated arbitration proceedings against Tessell's co-founders. Rather than leaving the dispute to the judicial process, however, Nutanix immediately launched its smear campaign, packaging its false allegations into pithy soundbites and embellishing them in a public web post that it called a "press release," libeling Tessell and its co-founders and falsely stating that Tessell's new service was solely the result of "nefarious" and "egregious" actions involving criminal conduct such as "unfettered theft" of Nutanix's intellectual property and source code.[10] Mr. Ramaswami, Mr. Wall, and other Nutanix directors and officers were directly involved in drafting the falsehoods and authorizing them for publication.

---

[10] Nutanix.com, "Nutanix Files Theft of Intellectual Property Lawsuit against Tessell, Inc.," (Mar. 20, 2024) (https://www.nutanix.com/press-releases/2024/nutanix-files-theft-of-intellectual-property-lawsuit-against-tessell-inc).

COMPLAINT AND DEMAND FOR JURY TRIAL

74. The "press release" accused the Tessell founders of having "covertly designed, built, demonstrated, and secured financing for the future Tessell product, using Nutanix source code, servers and other resources." This was knowingly false. The Tessell co-founders, in pitching the idea of a spin-off business unit to Nutanix and its affiliated private equity firm, were proposing to further develop the capacity of Nutanix Era for the benefit of Nutanix. Nutanix's officers and board members knew about these plans and initially supported them. Mr. Ramaswami himself reviewed the business plan and made comments on it. Mr. Maner, in his capacity as a Nutanix executive, introduced Mr. Kuchibhotla to board members and potential investors to help develop support and funding for the business plan. Nothing was improper, covert, or nefarious about this, and Nutanix's leadership knew about all of it. What Nutanix falsely and knowingly called a "prototype" was nothing more than a presentation with UI screens showing what the new service could potentially look like on the web; it was not a functioning prototype running on Nutanix's servers, and Nutanix knew that, or at a minimum should have recognized that through any responsible and diligent investigation.

75. The "press release" went on to falsely accuse the Tessell co-founders of having "schemed to remove all indicia of Nutanix branding from their prototype." Again this was knowingly, or at least recklessly, false. In pitching an idea for a new business unit within Nutanix, Mr. Kuchibhotla did not want to use the old Nutanix Era branding in the mockup. He wanted to show Mr. Ramaswami, Mr. Maner, and others at Nutanix something new—a vision for a website like that operated by the software company Snowflake—that would be worthy of a significant investment. There was never any "prototype." There was simply a slide deck with user interface screens that Mr. Kuchibhotla presented to Nutanix executives and board members.

76. The "press release" also falsely stated that the founders of Tessell "took Nutanix Era source code with them to Tessell, which used it." Even the baseless complaint was more restrained than this, having alleged that one of the founders had supposedly "synced a large amount of Era source code to his personal iCloud account." Here is the truth: Like millions of other people, that founder had long before set a preference that automatically backed up information stored on his laptop to his iCloud account. Moreover, the iCloud backup did not

include Nutanix Era source code. At the very most it included certain scripts that he used to expedite tasks that he performed when visiting customer sites. Those scripts were not "Nutanix Era source code," and are irrelevant to either the Nutanix Era product or to Tessell's groundbreaking cloud-based service. The backups were also just standard and automatic preferences set on a laptop, not on any Nutanix Era code or any source code from Nutanix repositories. Nutanix employs hundreds of engineers who could have understood the lack of merit in this and Nutanix's other forensic claims, yet Nutanix nevertheless continues to repeat them, including every day in its public advertising post.

77. The "press release" then falsely claimed that the co-founders "tried to cover their tracks by wiping their Nutanix laptops." Of the six Nutanix computers used by the founders while they were employed at Nutanix, three had data erased from them (with no data being erased from any device used by Mr. Khanuja). The purpose for deleting data was not to "cover their tracks"; it was to remove personal and private information that had been stored on the work computers during their employment that they did not want to be accessed by subsequent Nutanix staff who used the devices. Indeed, the Tessell founders were well aware that Nutanix regularly backed up Nutanix computers into long-term storage such that the information that had been stored on the computers could be restored by Nutanix if it wanted access to it. Indeed, on information and belief, and as Nutanix's purported investigation showed, the data was always available to Nutanix even after personal information was deleted from the devices for entirely valid privacy reasons.

78. After purporting to summarize the allegations in the complaint, the press release went on to quote Tyler Wall, Nutanix's then-Chief Legal Officer, who feigned outrage at what he had purportedly seen come out of the fabricated forensic investigation—without disclosing any specifics to substantiate his disparaging claims:

> "It has been **shocking** to learn of the behavior of these former employees during their employment, the **scope of what they took** from Nutanix, and the **steps they took to hide** their use of Nutanix resources to found their company. … Nutanix believes strongly in fair competition and its importance and value to the industry overall, and it is with deliberate and thoughtful consideration that we have

-22-
COMPLAINT AND DEMAND FOR JURY TRIAL

decided to file this lawsuit. ***The facts that our investigation uncovered were egregious.***"[11]

79. The "press release" went on, sanctimoniously saying that "Nutanix believes in innovation, but stealing intellectual property and source code is not innovation. Nutanix does not have a history of suing companies or people. The facts found in this situation were ***too nefarious to ignore.***"[12]

80. Through the "press release," Nutanix used its unproven civil accusations as fodder for advertising copy, appealing to current and prospective customers to view Nutanix as "a leader in hybrid multicloud computing" that "believes in innovation" and is "trusted by companies worldwide," in contrast to the supposedly "nefarious" team at Tessell. Nutanix touted its "Nutanix Database Service" product as a "valued part of the Company's product portfolio" whose honor it was forced to defend against the supposedly "shocking" deeds of the Tessell founders.

81. Nutanix finished the advertisement with a plug about itself in a section called "About Nutanix," describing itself as "a global leader in cloud software" that companies can rely on to "reduce complexity and simplify operations, freeing them to focus on their business outcomes." Nutanix continued: "Building on its legacy as the pioneer of hyperconverged infrastructure, Nutanix is trusted by companies worldwide to power hybrid multicloud environments consistently, simply, and cost-effectively." Nutanix then solicited their continued attention and business: "Learn more at www.nutanix.com or follow us on social media @nutanix." Nutanix has brazenly and continuously hosted this false ad on its public website to the present day, successfully and maliciously causing continued harm to Tessell and its founders while seeking to gain financial benefit for Nutanix's own suite of products.

82. By publicly accusing Tessell's founders of criminal "theft" and evidence destruction, Nutanix effectively sought to try and convict them in the court of public opinion of actions far worse than the civil claims it actually filed. In a criminal prosecution, the founders

---

[11] Italics added.
[12] Italics added.

would be entitled to the presumption of innocence, the right to confront witnesses, the requirement that the prosecution prove every element beyond a reasonable doubt, and the full panoply of constitutional protections afforded to the accused.  But in the "press release," Nutanix afforded the founders none of these protections.  Instead, it served as prosecutor, judge, and jury, publicly declaring the founders guilty of "unfettered theft" based on the self-serving conclusions of an undisclosed internal "investigation" that Nutanix has refused to subject to any scrutiny whatsoever.

83.    The smear campaign began working right away.  Tessell had multiple prospective customers who were actively engaged with Tessell to start using its service when the "press release" was issued.  These customers, including a large media company and a healthtech firm, cut ties with Tessell after seeing it, even forwarding the link to the "press release" and citing it as the reason.

84.    The "press release" is not the only component of Nutanix's smear campaign.  On information and belief, certain Nutanix officers and directors have continued to spread the same and related falsehoods, up to the present time, through oral and written communications with individuals and businesses in the industry, including Tessell's prospective customers and investors.  As Tessell understands, on information and belief, certain of Nutanix's officers and directors were directly responsible for hindering Tessell's Series B and other fundraising efforts through their continued dissemination of defamatory falsehoods, which Plaintiffs had no reason or ability to know about at the time, and only recently within the last year have learned that these activities likely occurred.  By virtue of the "press release" smear campaign and continued defamation, Defendants improperly scared away multiple venture capital funds and potential investors, and caused Tessell's Series B valuation to be significantly lower than it would have been otherwise.

85.    The statements made by Defendants in the press release and elsewhere are false and part of a vindictive campaign against Tessell and its founders, the pernicious result of Nutanix's losing in a race to build a successful cloud-native platform.  Despite every effort over several years to convince Nutanix to let him and his team operate as entrepreneurs and have a

share of ownership over their considerable efforts to advance Nutanix's technology, Mr. Kuchibhotla and his co-founders were left with little choice but to strike out on their own by founding Tessell. Nutanix's efforts to paint the Tessell founders as criminals and thieves, including through a baseless "press release" and quotes from its top in-house lawyer—then echoed by others—is a vile and bitter attempt to punish them for succeeding where Nutanix failed. Such bad faith conduct should not be allowed to stand.

## FIRST CLAIM FOR RELIEF

### Defamation

### (Against all Defendants)

86. Tessell incorporates all of the above paragraphs as though fully set forth herein.

87. Nutanix originally published its defamatory "press release" on March 20, 2024 by making it available on its public website at https://www.nutanix.com/press-releases/2024/nutanix-files-theft-of-intellectual-property-lawsuit-against-tessell-inc. Since that time, Nutanix and its officers and agents have consistently republished the statement through writing and by oral communication, including up to the present time. For example, on information and belief, Nutanix continues to repeat the defamatory statements from the "press release" to prospective investors and customers, including during Tessell's Series B round of funding in 2025 and subsequently, which Plaintiffs have only learned about within the last year.

88. The "press release" was knowingly false and malicious (or at the very least made with reckless disregard of the truth). Nutanix and its officers and agents had no good faith basis to accuse Tessell or its founders of any of the wrongdoing alleged in the publication or any subsequent republication or oral communication. Tessell and its founders did not engage in "willful copyright and patent infringement," nor did they engage in "theft of Nutanix's source code and intellectual property related to the Company's database service offering." Tessell's founders never "covertly designed, built, demonstrated, and secured financing for the future Tessell product, using Nutanix source code, servers and other resources." Nor did they take "Nutanix Era source code with them to Tessell." They also never "schemed to remove all indicia of Nutanix branding from their prototype," or "tried to cover their tracks by wiping their Nutanix

-25-
COMPLAINT AND DEMAND FOR JURY TRIAL

laptops." Their actions at Nutanix and upon leaving to form Tessell involved no "theft", much less "unfettered theft," and were not "egregious," "shocking," or "too nefarious to ignore."

89. The statements in these publications, republications, and oral communications are defamatory on their face, having falsely accused Tessell and its founders of illegal and immoral activity that they never engaged in. The statements have had a direct and negative impact on the perception of Tessell and its founders by those who have heard or seen the defamatory statements. The statements directly attack and injure the founders in their profession by expressly accusing them of actions that are disreputable and illegal, including in their chosen line of work.

90. The statements were not privileged as they were voluntarily and gratuitously made outside of the litigation and go well beyond any proper news report about allegations made in the civil litigation. There was no legitimate reason whatsoever for Nutanix and its officers to post and repeat accusations publicly on their own website and through conversations with third parties who are not part of the litigation, especially where the litigation involves only civil claims and the Defendants' statements flagrantly read like a criminal indictment for trade secret theft under California Penal Code § 499c.

91. The defamatory statements have a natural tendency to cause harm to Tessell and its founders by virtue of their slanderous and salacious content. Any reasonable person reading or hearing the statements would know that they are inflammatory and intended to bring disrepute on their targets. A publication that charges a person with a crime constitutes slander and libel per se. *See* California Civil Code §§ 45a & 46(1). The same is true of any false statement that "[t]ends directly to injure him in respect to his office, profession, trade or business." *See id.* § 46(3). The press release does precisely these things: it imputes to each of the individual Plaintiffs the commission of a serious crime in establishing their new business, using language ("theft," "stolen," "unfettered theft," "cover their tracks," "nefarious," "shocking," "schemed," "covertly," "egregious," etc.) that no reasonable reader could understand as referring to anything other than alleged criminal conduct. On information and belief, Defendants and their agents have continued to repeat the defamatory statements in oral and written communications up to the present, whether

through direct means or by directing people anew to the false "press release". Damages are therefore presumed.

92. As a direct and proximate result of Defendants' false and defamatory statements, Plaintiffs have suffered and will continue to suffer general and special damages, including harm to reputation, loss of goodwill, lost business and future economic opportunities, lost sales to prospective customers, and lost investments from prospective investors in amounts to be proven at trial. The three founders have additionally been harmed through humiliation, anxiety, mental worry, and emotional distress. They have also suffered a diminution in value of their equity shares in Tessell.

93. Defendants' conduct was willful, wanton, and malicious, entitling Plaintiffs to an award of exemplary and punitive damages.

94. Plaintiffs have been and will continue to be irreparably harmed by Defendants' conduct, including insofar as Plaintiffs' invaluable goodwill and business reputations are being damaged, and Plaintiffs lack an adequate remedy at law to fully compensate for this harm and damage. Unless enjoined, Defendants will continue their misconduct. Plaintiffs also seek an order requiring Defendants to post and pay for any and all corrective advertising needed to counteract the effects of the defamation.

## SECOND CLAIM FOR RELIEF

### Trade Libel

### (Against all Defendants)

95. Tessell incorporates all of the above paragraphs as though fully set forth herein.

96. Nutanix originally published its defamatory and libelous "press release" on March 20, 2024 by making it available on its public website at https://www.nutanix.com/press-releases/2024/nutanix-files-theft-of-intellectual-property-lawsuit-against-tessell-inc. Since that time, Nutanix and its officers and agents have consistently republished the statement through writing and by oral communication, including up to the present time.

97. The "press release" was knowingly false and malicious (or at the very least made with reckless disregard of the truth). Nutanix and its officers and agents had no good faith basis

to accuse Tessell or its founders of any of the wrongdoing alleged in its publication or any subsequent republication. The "press release" was aimed not only at harming the founders personally, but also at undermining the entirety of their and Tessell's business and service offerings by directly accusing those things of being entirely based on illegal and immoral conduct, for example, saying that "stealing intellectual property and source code is not innovation."

98. Nutanix also used the "press release" in an attempt to bolster its own products and services among prospective and current customers and investors and to scare away the same from engaging with Tessell. For example, the press release begins with Nutanix listing its stock ticker symbol "(NASDAQ: NTNX)" and touting itself as "a leader in hybrid multicloud computing." It also promotes Nutanix's supposed virtue throughout: "Nutanix believes strongly in fair competition and its importance and value to the industry overall;" "Nutanix does not have a history of suing companies or people" but "the facts found in this situation were too nefarious to ignore." The "press release" also promotes Nutanix's own services in contrast to the supposed depravity of Tessell's: "Nutanix Database Service is a valued part of the Company's product portfolio, and unfettered theft of its intellectual property and source code cannot go unaddressed"; "Nutanix believes in innovation, but stealing intellectual property and source code is not innovation." The so-called "press release" even ends with an "About Nutanix" section where Nutanix advertises itself in glowing language and invites readers to explore its website and follow it on social media:

> Nutanix is a global leader in cloud software, offering organizations a single platform for running apps and data across clouds. With Nutanix, companies can reduce complexity and simplify operations, freeing them to focus on their business outcomes. Building on its legacy as the pioneer of hyperconverged infrastructure, Nutanix is trusted by companies worldwide to power hybrid multicloud environments consistently, simply, and cost effectively. Learn more at www.nutanix.com or follow us on social media @nutanix.

99. All of this is in stark and deliberate contrast to the libelous statements about Tessell and its own products. The so-called "facts" listed in the "press release" are entirely false. Tessell and its founders did not engage in "willful copyright and patent infringement," nor did they engage in "theft of Nutanix's source code and intellectual property related to the Company's database service offering." Tessell's founders never "covertly designed, built, demonstrated, and secured

-28-
COMPLAINT AND DEMAND FOR JURY TRIAL

financing for the future Tessell product, using Nutanix source code, servers and other resources." Nor did they take "Nutanix Era source code with them to Tessell." They also never "schemed to remove all indicia of Nutanix branding from their prototype," or "tried to cover their tracks by wiping their Nutanix laptops." Their actions at Nutanix and upon leaving to form Tessell involved no "theft," much less "unfettered theft," and were not "egregious," "shocking," or "too nefarious to ignore."

100. The statements in these publications and republications are false and libelous on their face, falsely accusing Tessell and its founders of illegal and immoral activity that they never engaged in. The statements have had a direct and negative impact on the perception of Tessell and its founders for those who have heard or seen the libelous advertisement and hit piece guised as a "press release." The statements directly attack and injure Tessell and its founders in their profession by expressly accusing them of actions that are disreputable and illegal in their chosen line of work and of having brought to market a service based on theft and not innovation, all of which is false.

101. Nutanix and its officers and directors knew the statements in the "press release" were untrue or at the very least they acted with reckless disregard of the truth. The sham investigation that they conducted was designed from the start to conjure up supposed "evidence" of wrongdoing, not to actually find or promote the truth. Nutanix and those acting on its behalf knew or should have known this.

102. Nutanix and its officers and directors also knew or should have known that others would act in reliance on their false statements. Indeed, Nutanix publicly posted the statements on their website as a "press release." There could have been no other impetus but to have members of the public anywhere in the world read the statements, believe them to be true, and then act on them. Any prospective customer or investor searching for "Nutanix" or "Tessell" through an online search engine would be expected to come across the "press release." New AI services such as ChatGPT, Claude, and Gemini would be expected to train on the publicly available "press release" as well, embedding its libelous content into their models so that it gets repeated to users of those services as well.

COMPLAINT AND DEMAND FOR JURY TRIAL

103. The defamatory statements have a natural tendency to cause harm to Tessell and its founders by virtue of their slanderous and salacious content. Any reasonable person reading or hearing the statements would know that they are inflammatory and intended to bring disrepute on their targets.

104. Plaintiffs have also experienced special harm as a direct and proximate result of the ongoing trade libel, including harm to business and professional reputations, loss of goodwill, lost business and future economic opportunities, lost sales to prospective customers, lost investments from prospective investors, and disparagement of the quality of their goods and services in amounts to be proven at trial. The three founders have additionally suffered the diminution of their equity shares in Tessell as a result of Defendants' misconduct.

105. Defendants also acted with actual malice and intent to cause harm, justifying an award of exemplary and punitive damages.

106. Plaintiffs have been and will continue to be irreparably harmed by Defendants' conduct, including insofar as Plaintiffs' invaluable goodwill and business reputations are being damaged, and Plaintiffs lack an adequate remedy at law to fully compensate for this harm and damage. Unless enjoined, Defendants will continue their misconduct. Plaintiffs also seek an order requiring Defendants to post and pay for any and all corrective advertising needed to counteract the effects of the trade libel.

### THIRD CLAIM FOR RELIEF

**Intentional Interference with Prospective Economic Advantage**

**(Against all Defendants)**

107. Tessell incorporates all of the above paragraphs as though fully set forth herein.

108. Since its inception in March 2021, Tessell has been attempting to secure funding from prospective investors. Nutanix and its officers and directors were well aware of this. In fact, some of those individuals invested in Tessell themselves, or offered to do so. And since at least October 2022, when Tessell launched its service, it has been seeking out customers to pay for its cloud-native database service. Nutanix and its agents were aware of this as well. On information and belief, prior to posting its "press release" and subsequently as well, Nutanix has had

conversations with various businesses in search of database management services that were considering Tessell's service. One of Defendants' chief aims in continuously posting the "press release" and repeating its libelous content in conversations with current and potential customers is to drive them away from Tessell's services and toward Nutanix's for the purpose of usurping the economic and reputational advantages of paid subscriptions and sales. Defendants were also motivated to slow down the growth of Tessell's business while Nutanix works to play catchup in offering its own competitive service in the future, which it is currently working on. By doing so, Defendants hope Nutanix will capture a greater share of the market in the future, while also enjoying the present benefit of customers it has already channeled to itself and away from Tessell.

109. Defendants' false and disparaging statements have already been successful in poisoning the view that various investors and prospective customers have of Tessell and its founders as well as Tessell's services. And this is separate and apart from any negative effect that litigation alone would have had if Defendants had chosen to keep the dispute solely in the confines of the judicial system where various important guardrails exist that require Nutanix to prove its claims and provide Tessell and its founders the ability to defend themselves through cross examination and the introduction of their own evidence. No such protections exist where Defendants have chosen to "litigate" in the public marketplace through falsehoods and unlawful means.

110. Already, Tessell has missed out on potential investor funding and customer subscriptions in the millions of dollars that they would have had but for Defendants' unlawful actions.

111. As a result of Defendants' intentional and wrongful interference, Plaintiffs have suffered loss of business expectancy, profits, goodwill, enterprise value, and equity value in amounts to be determined at trial.

112. Defendants' conduct was malicious, oppressive, and fraudulent, warranting exemplary and punitive damages.

113. Plaintiffs have been and will continue to be irreparably harmed by Defendants' conduct, including insofar as Plaintiffs' invaluable goodwill and business reputations are being

damaged, and Plaintiffs lack an adequate remedy at law to fully compensate for this harm and damage. Unless enjoined, Defendants will continue their misconduct.

### FOURTH CLAIM FOR RELIEF

### Negligent Interference with Prospective Economic Advantage

### (Against all Defendants)

114. Tessell incorporates all of the above paragraphs as though fully set forth herein.

115. Since its inception in March 2021, Tessell has been attempting to secure funding from prospective investors. Nutanix and its officers and directors were well aware of this. In fact, some of those individuals invested in Tessell themselves, or offered to do so. And since at least October 2022, when Tessell launched its service, it has been seeking out customers to pay for its cloud-native database service. Nutanix and its agents were aware of this as well. On information and belief, prior to posting its "press release" and subsequently as well, Nutanix has had conversations with various businesses in search of database management services that were considering Tessell's service. One of Defendants' chief aims in continuously posting the "press release" and repeating its libelous content in conversations with current and potential customers is to drive them away from Tessell's services and toward Nutanix's for the purpose of usurping the economic and reputational advantages of paid subscriptions and sales. Defendants were also motivated to slow down the growth of Tessell's business while Nutanix works to play catchup in offering its own competitive service in the future, which it is currently working on. By doing so, Defendants hope Nutanix will capture a greater share of the market in the future, while also enjoying the present benefit of customers it has already channeled to itself and away from Tessell.

116. Defendants owed a duty to deal fairly with Plaintiffs in the marketplace and to not use illegal means to obtain an economic advantage or to harm the Plaintiffs. Defendants also owed a duty to deal fairly and honestly with third parties, including Tessell's prospective customers and investors. Defendants knew or should have known that Plaintiffs' relationships with these prospective customers and investors would be disrupted if Defendants failed to act with reasonable care.

117. Defendants have breached that duty and failed to act with reasonable care. Quite the opposite, they acted with actual intent to harm Plaintiffs and disrupt their business affairs. Defendants' false and disparaging statements have already been successful in poisoning the view that various investors and prospective customers have of Tessell and its founders as well as Tessell's services. And this is separate and apart from any negative effect that litigation alone would have had if Defendants had chosen to keep the dispute solely in the confines of the judicial system where various important guardrails exist that require Nutanix to prove its claims and provide Tessell and its founders the ability to defend themselves through cross examination and the introduction of their own evidence. No such protections exist where Defendants have chosen to "litigate" in the public marketplace through falsehoods and unlawful means.

118. Already, Tessell has missed out on potential investor funding and customer subscriptions in the millions of dollars that they would have had but for Defendants' unlawful actions.

119. As a result of Defendants' negligent interference, Plaintiffs have suffered loss of business expectancy, profits, goodwill, enterprise value, and equity value in amounts to be determined at trial.

120. Plaintiffs have been and will continue to be irreparably harmed by Defendants' conduct, including insofar as Plaintiffs' invaluable goodwill and business reputations are being damaged, and Plaintiffs lack an adequate remedy at law to fully compensate for this harm and damage. Unless enjoined, Defendants will continue their misconduct.

## FIFTH CLAIM FOR RELIEF

### False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)

### (Against Nutanix)

121. Tessell incorporates all of the above paragraphs as though fully set forth herein.

122. Nutanix originally published its false and defamatory "press release" on March 20, 2024 by making it available on its public website at https://www.nutanix.com/press-releases/2024/nutanix-files-theft-of-intellectual-property-lawsuit-against-tessell-inc. Since that

time, Nutanix and its officers and agents have consistently republished the statement through writing and by oral communication, including up to the present time.

123.    The "press release" was knowingly false and malicious (or at the very least made with reckless disregard of the truth).  Nutanix and its officers and agents had no good faith basis to accuse Tessell or its founders of any of the wrongdoing alleged in the publication or any subsequent republication.

124.    The "press release" was not a news publication, but an advertisement drafted solely by Nutanix and posted on its own website with the intent to bolster demand for its own products and services among prospective and current customers and investors and to scare away the same from engaging with Tessell.  For example, the so-called "press release" bears the Nutanix logo and begins with Nutanix listing its ticker symbol "(NASDAQ: NTNX)" and touting itself as "a leader in hybrid multicloud computing."  It also promotes Nutanix's supposed virtue throughout: "Nutanix believes strongly in fair competition and its importance and value to the industry overall"; "Nutanix does not have a history of suing companies or people" but "the facts found in this situation were too nefarious to ignore."  The "press release" also promotes Nutanix's own services in contrast to the supposed depravity of Tessell's:  "Nutanix Database Service is a valued part of the Company's product portfolio, and unfettered theft of its intellectual property and source code cannot go unaddressed"; "Nutanix believes in innovation, but stealing intellectual property and source code is not innovation."  The so-called "press release" even contains an "About Nutanix" section where Nutanix advertises itself in glowing language and invites readers to explore its website and follow it on social media:

> Nutanix is a global leader in cloud software, offering organizations a single platform for running apps and data across clouds. With Nutanix, companies can reduce complexity and simplify operations, freeing them to focus on their business outcomes. Building on its legacy as the pioneer of hyperconverged infrastructure, Nutanix is trusted by companies worldwide to power hybrid multicloud environments consistently, simply, and cost effectively.  Learn more at www.nutanix.com or follow us on social media @nutanix.

125.    The "press release" also contains a disclaimer section at the bottom that is indicative of advertising not a news article.  For example, it includes trademark restrictions and

-34-
COMPLAINT AND DEMAND FOR JURY TRIAL

makes disclaimers about "forward-looking statements, which are not historical facts," says that "actual results may differ materially and adversely from those anticipated or implied by such statements," and includes other such language that is clearly meant to comply with regulations from governmental bodies such as the Securities and Exchange Commission that govern the advertising and sale of securities.

126. All of this is in stark and deliberate contrast to the defamatory statements made about Tessell and its own products. The so-called "facts" listed in the "press release" about Tessell and its founders are stated as proven and true when they are entirely false. Tessell and its founders did not commit "willful copyright and patent infringement," nor did they engage in "theft of Nutanix's source code and intellectual property related to the Company's database service offering." Tessell's founders never "covertly designed, built, demonstrated, and secured financing for the future Tessell product, using Nutanix source code, servers and other resources." Nor did they take "Nutanix Era source code with them to Tessell." They also never "schemed to remove all indicia of Nutanix branding from their prototype," or "tried to cover their tracks by wiping their Nutanix laptops." Their actions at Nutanix and upon leaving to form Tessell involved no "theft", much less "unfettered theft," and were not "egregious," "shocking," or "too nefarious to ignore."

127. Even where the "press release" ostensibly summarizes allegations within the federal district court complaint, and it may be literally true that the complaint included such (false) allegations, those accusations are nevertheless misleading and deceptive in the context of the "press release" because they are designed to be read as established facts in light of the full advertisement, which includes, for example, extrajudicial quotes from Nutanix's Chief Legal Officer claiming firsthand knowledge of the veracity of the "facts", as well as gratuitous, sensational, and salacious descriptions of how "egregious" and "shocking" they were. All of this is intended to convince any reasonable customer or investor reading the advertisement that the case was open and shut before it had ever been litigated.

128. The statements in these publications and republications are defamatory on their face, falsely accusing Tessell and its founders of illegal and immoral activity that they never engaged in. The statements have had a direct and negative impact on the perception of Tessell and its

founders for those who have heard or seen the advertisement, which is a hit piece guised as a "press release". The statements directly attack and injure Tessell and its founders in their profession by expressly accusing them of actions that are disreputable and illegal in their chosen line of work and of having brought to market a service based on theft and not innovation, all of which are false.

129. Nutanix and its officers and directors knew the statements in the "press release" were untrue or at the very least they acted with reckless disregard of the truth. The sham investigation that they conducted was designed from the start to conjure up supposed "evidence" of wrongdoing, not to actually find or promote the truth. Nutanix and those acting on its behalf knew or should have known this.

130. Nutanix and its officers and directors also knew or should have known that others would act in reliance on their false statements. Indeed, Nutanix publicly posted the statements on their website as a "press release". There could have been no other impetus but to have members of the public anywhere in the world read the statements, believe them to be true, and then act on them. Any prospective customer or investor searching for "Nutanix" or "Tessell" through an online search engine could be expected to come across the "press release." New AI services such as ChatGPT, Claude, and Gemini would be expected to train on the publicly available "press release" as well, embedding its libelous content into their models so that it gets repeated to users of those services as well.

131. The false and defamatory statements in Nutanix's advertising have a natural tendency to cause harm to Tessell and its founders by virtue of their slanderous and salacious content. Any reasonable person reading or hearing the statements would know that they are inflammatory and intended to bring disrepute on their targets. Indeed, in conversations with actual prospective customers and investors, Tessell and its officers have heard time and again that the false accusations made by Nutanix in its press release gave the prospective customers and investors grave concerns about doing business with Tessell or investing in it and in fact caused them not to do so.

132. As a direct and proximate result of Nutanix's false advertising, Plaintiffs have suffered and will continue to suffer general and special damages, including damage to business reputation and loss of goodwill, as well as lost business and future economic opportunities, lost sales to prospective customers, and lost investments from prospective investors in amounts to be proven at trial. Plaintiffs also seek an award of up to three times their actual damage pursuant to 15 U.S.C. § 1117(a).

133. Defendants have also been unjustly enriched by their misconduct, entitling Plaintiffs to an accounting and disgorgement of Defendants' profits pursuant to 15 U.S.C. § 1117(a). To the extent the amount of recovery based on profits is inadequate, Plaintiffs further seek judgment for such sum as the court shall find to be just.

134. Plaintiffs have been and will continue to be irreparably harmed by Defendants' conduct, including insofar as Plaintiffs' invaluable goodwill and business reputations are being damaged, and Plaintiffs lack an adequate remedy at law to fully compensate for this harm and damage. Unless enjoined, Defendants will continue their misconduct.

135. Plaintiffs therefore seek all available relief, including trebled damages, disgorgement of Defendants' profits, costs, and injunctive relief, together with attorneys' fees in light of the exceptional nature of the case, pursuant to 15 U.S.C. § 1117(a). Plaintiffs also seek an order requiring Defendants to post and pay for any and all corrective advertising needed to counteract the effects of the false advertising.

## SIXTH CLAIM FOR RELIEF

### False Advertising in Violation of Cal. Bus. & Prof. Code § 17500 *et seq.*

### (Against Nutanix)

136. Tessell incorporates all of the above paragraphs as though fully set forth herein.

137. Nutanix originally published its false and defamatory "press release" on March 20, 2024 by making it available on its public website at https://www.nutanix.com/press-releases/2024/nutanix-files-theft-of-intellectual-property-lawsuit-against-tessell-inc. Since that time, Nutanix and its officers and agents have consistently republished the statement through writing and by oral communication, including up to the present time.

138. The "press release" was knowingly false and malicious (or at the very least made with reckless disregard of the truth). Nutanix and its officers and agents had no good faith basis to accuse Tessell or its founders of any of the wrongdoing alleged in its publication or any subsequent republication.

139. The "press release" was also not a news publication, but an advertisement drafted solely by Nutanix and posted on its own website with the intent to bolster its own products and services among prospective and current customers and investors and to scare away the same from engaging with Tessell. For example, the so-called "press release" bears the Nutanix logo and begins with Nutanix listing its stock's ticker symbol "(NASDAQ: NTNX)" and touting itself as "a leader in hybrid multicloud computing." It also promotes Nutanix's supposed virtue throughout: "Nutanix believes strongly in fair competition and its importance and value to the industry overall"; "Nutanix does not have a history of suing companies or people" but "the facts found in this situation were too nefarious to ignore." The "press release" also promotes Nutanix's own services in contrast to the supposed depravity of Tessell's: "Nutanix Database Service is a valued part of the Company's product portfolio, and unfettered theft of its intellectual property and source code cannot go unaddressed"; "Nutanix believes in innovation, but stealing intellectual property and source code is not innovation." The so-called "press release" even ends with an "About Nutanix" section where Nutanix advertises itself in glowing language and invites readers to explore its website and follow it on social media:

> Nutanix is a global leader in cloud software, offering organizations a single platform for running apps and data across clouds. With Nutanix, companies can reduce complexity and simplify operations, freeing them to focus on their business outcomes. Building on its legacy as the pioneer of hyperconverged infrastructure, Nutanix is trusted by companies worldwide to power hybrid multicloud environments consistently, simply, and cost effectively. Learn more at www.nutanix.com or follow us on social media @nutanix.

140. The "press release" also contains a disclaimer section at the bottom that is indicative of advertising copy not a news article. For example, it includes trademark restrictions and makes disclaimers about "forward-looking statements, which are not historical facts," says that "actual results may differ materially and adversely from those anticipated or implied by such

-38-
COMPLAINT AND DEMAND FOR JURY TRIAL

statements," and includes other such language that is clearly meant to comply with regulations from governmental bodies such as the Securities and Exchange Commission that govern the advertising and sale of securities.

141.   All of this is in stark and deliberate contrast to the libelous statements made about Tessell and its own products.  The so-called "facts" listed in the "press release" are entirely false.  Tessell and its founders did not commit "willful copyright and patent infringement," nor did they engage in "theft of Nutanix's source code and intellectual property related to the Company's database service offering."  Tessell's founders never "covertly designed, built, demonstrated, and secured financing for the future Tessell product, using Nutanix source code, servers and other resources."  Nor did they take "Nutanix Era source code with them to Tessell."  They also never "schemed to remove all indicia of Nutanix branding from their prototype," or "tried to cover their tracks by wiping their Nutanix laptops."  Their actions at Nutanix and upon leaving to form Tessell involved no "theft", much less "unfettered theft," and were not "egregious," "shocking," or "too nefarious to ignore."

142. Even where the "press release" ostensibly describes allegations within the federal district court complaint, and it may be literally true that the complaint included such allegations, those accusations are nevertheless misleading and deceptive in the context of the "press release" because they are designed to be read as established facts in light of the full advertisement, which includes extrajudicial quotes from Nutanix's Chief Legal Officer claiming firsthand knowledge of the veracity of the "facts", as well as gratuitous, sensational, and salacious descriptions of how "egregious" and "shocking" they were.  All of this was intended to convince any reasonable consumer that the case was open and shut before it had ever been litigated.

143.  The statements in these publications and republications are defamatory on their face, falsely accusing Tessell and its founders of illegal and immoral activity that they never engaged in.  The statements have had a direct and negative impact on the perception of Tessell and its founders by those who have seen the advertisement, which is a hit piece guised as a "press release".  The statements directly attack and injure Tessell and its founders in their profession by expressly

accusing them of actions that are disreputable and illegal in their chosen line of work and of having brought to market a service based on theft and not innovation, all of which are false.

144. Nutanix and its officers and directors knew the statements in the "press release" were untrue or at the very least they acted with reckless disregard of the truth. The sham investigation that they conducted was designed from the start to conjure up supposed "evidence" of wrongdoing, not to actually find or promote the truth. Nutanix and those acting on its behalf knew or should have known this.

145. Nutanix and its officers and directors also knew or should have known that others would act in reliance on their false statements. Indeed, Nutanix publicly posted the statements on their website as a "press release". There could have been no other impetus but to have members of the public anywhere in the world read the statements, believe them to be true, and then act on them. Any prospective customer or investor searching for "Nutanix" or "Tessell" through an online search engine could be expected to come across the "press release." New AI services such as ChatGPT, Claude, and Gemini would be expected to train on the publicly available "press release" as well, embedding its libelous content into their models so that it gets repeated to users of those services as well.

146. The false advertisement has had a natural tendency to cause harm to Tessell and its founders by virtue of its slanderous and salacious content. Any reasonable person reading or hearing the statements would know that they are inflammatory and intended to bring disrepute on their targets and the products and services Tessell offers.

147. Tessell and its founders have also experienced special harm as a direct result of the ongoing false advertising, including lost sales to prospective customers and lost investments from prospective investors, as well as diminished business and equity value as a result. Indeed, in conversations with prospective customers and investors, Tessell and its officers have heard time and again that the false accusations made by Nutanix in its press release gave prospective customers and investors grave concerns about doing business with Tessell or investing in it and in fact caused them not to do so.

148. Plaintiffs therefore seek all remedies permitted, including restitution, injunctive relief, and disgorgement of profits as permitted under California Business & Professions Code § 17535, together with attorneys' fees and costs as allowed by law.  Plaintiffs also seek an order requiring Defendants to post and pay for any and all corrective advertising needed to counteract the effects of the false advertising.

## SEVENTH CLAIM FOR RELIEF

### Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq*

### (Against Nutanix)

149. Tessell incorporates all of the above paragraphs as though fully set forth herein.

150. The same conduct alleged for each of the above causes of action also constitutes a violation of the California Unfair Competition Law, which defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."  Cal. Bus. & Prof. Code § 17200.  Defamation, trade libel, intentional and negligent interference with prospective economic advantage, and false advertising (both federal and state) are necessarily unlawful, unfair, and fraudulent.

151. Tessell and its founders have also experienced special harm as a direct result of the ongoing unfair competition, including lost sales to prospective customers and lost investments from prospective investors, as well as diminished business and equity value.  Indeed, in conversations with prospective customers and investors, Tessell and its officers have heard time and again that the false accusations made by Nutanix in its press release gave prospective customers and investors grave concerns about doing business with Tessell or investing in it and in fact caused them not to do so.

152. Plaintiffs therefore seek all remedies permitted, including restitution, injunctive relief, and disgorgement of profits, under California Business & Professions Code §§ 17203 and 17205, together with attorneys' fees and costs as allowed by law.  Plaintiffs also seek an order requiring Defendants to post and pay for any and all corrective advertising needed to counteract the effects of the unfair competition.

COMPLAINT AND DEMAND FOR JURY TRIAL

**EIGHTH CLAIM FOR RELIEF**

**Intentional Infliction of Emotional Distress**

**(On Behalf of the Individual Plaintiffs Against all Defendants)**

153.  Tessell incorporates all of the above paragraphs as though fully set forth herein.

154.  Defendants have continuously engaged in extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress to the Plaintiffs.  Defendants are uniquely situated in a position of power and authority to harm Plaintiffs' interests by virtue of being their former employer and its management.  Defendants know that their false accusations of illegal conduct against the Plaintiffs come from a position of power because they have significantly more resources than Plaintiffs, can make authoritative proclamations about what Plaintiffs supposedly did while at Nutanix and third parties cannot independently verify the information, and Nutanix likewise has complete and sole control over significant evidence that exculpates the Plaintiffs that Nutanix has refused to acknowledge, reveal or produce.  From this privileged position of an obvious imbalance of power in Defendants' favor, Defendants have engaged in all of the actions and misconduct alleged herein for malicious purposes, including at least retaliating against the individual Plaintiffs for Defendants' own mistakes and failures, trying to devastate Tessell's business or alternatively usurp control over it, causing the individual Plaintiffs to be fired and stripped of their equity in Tessell entirely, and destroying the personal and business reputations of the Plaintiffs and their products.  Defendants have acted intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress for the individual Plaintiffs.

155. As a result, the individual Plaintiffs have suffered severe or extreme emotional distress for the past two years.  All of their independent and innovative work at Tessell has been overshadowed by Defendants' lies, falsehoods, and malicious misuse of legal proceedings and negotiations.   The individual Plaintiffs have worked under extreme stress, believing that everything they have worked for will be wrongfully taken from them and their personal and professional careers irreparably harmed.  Individual Plaintiffs have received messages from former colleagues questioning their morality and religious beliefs as a result of Defendants'

egregious misconduct.  The individual Plaintiffs have suffered extreme distress from needlessly losing business contacts, friends and colleagues due to Defendants' outrageous misconduct.

156.  The actual and proximate cause of all of the individual Plaintiffs' anxiety, suffering, humiliation, worry, turmoil and emotional distress is the Defendants' conduct.  The individual Plaintiffs seek compensatory damages (both economic and non-economic) for all harm caused by Defendants' intentional infliction of emotional distress, including damages for pain, suffering, and emotional distress.  The individual Plaintiffs also seek punitive damages as Defendants' conduct involves malice.

## NINTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

### (By the Individual Plaintiffs Against all Defendants)

157.  Tessell incorporates all of the above paragraphs as though fully set forth herein.

158.  Defendants' conduct also qualifies as negligent infliction of emotional distress. Defendants have continuously engaged in conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress to the Plaintiffs.  Defendants are uniquely situated in a position of power and authority to harm Plaintiffs' interests by virtue of being their former employer and its management.  Defendants know that their false accusations of illegal conduct against the Plaintiffs come from a position of power because they have significantly more resources than Plaintiffs, can make authoritative proclamations about what Plaintiffs supposedly did while at Nutanix and third parties cannot independently verify the information, and Nutanix likewise has complete and sole control over significant evidence that exculpates the Plaintiffs that Nutanix has refused to acknowledge, reveal or produce.  From this privileged position of an obvious imbalance of power in Defendants' favor, Defendants have a duty to act with reasonable care toward the Plaintiffs.  Instead, Defendants have breached that duty by engaging in all of the actions and misconduct alleged herein for malicious purposes, including at least retaliating against Plaintiffs for Defendants' own mistakes and failures, trying to devastate Tessell's business or alternatively usurp control over it, causing the individual

Plaintiffs to be fired and stripped of their equity in Tessell entirely, and destroying the personal and business reputations of the Plaintiffs and their products.

159. As a result, the individual Plaintiffs have suffered severe or extreme emotional distress for the past two years. All of their independent and innovative work at Tessell has been overshadowed by Defendants' false and malicious "press release," public smear campaign, oral defamation, and attempt to misuse legal proceedings and negotiations to destroy the individual Plaintiffs' lives and careers. The individual Plaintiffs have worked under extreme stress, believing that everything they have worked for will be wrongfully taken from them and their personal and professional careers irreparably harmed. The individual Plaintiffs have received messages from former colleagues questioning their morality and religious beliefs as a result of Defendants' egregious misconduct. The individual Plaintiffs have suffered extreme distress from needlessly losing business contacts, friends and colleagues due to Defendants' outrageous misconduct.

160. The actual and proximate cause of all of the individual Plaintiffs' anxiety, suffering, humiliation, worry, turmoil and emotional distress is the Defendants' conduct. The individual Plaintiffs seek compensatory damages (both economic and non-economic) for all harm caused by Defendants' negligent infliction of emotional distress, including damages for pain, suffering, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants, inclusive as follows:

1. Awarding monetary relief as described in each of the above claims in favor of Plaintiffs and against Defendants in amounts to be determined at trial, including enhanced and treble damages where available;

2. Awarding equitable relief as described in each of the above claims in favor of Plaintiffs and against Defendants, including restitution and disgorgement in amounts to be determined at trial;

3. Ordering an accounting of all Defendants' sales and profits, including pursuant to 15 U.S.C. § 1117(a);

4.    Granting injunctive relief against Defendants and all persons or entities acting in concert or participation with them, including an order for Defendants to immediately cease and desist from any and all publication, re-publication, or dissemination (whether written or oral) of all challenged statements, writings, and advertisements;

5.    Granting declarative relief that Defendants' challenged statements and advertisements are false, libelous, and defamatory, and requiring Defendants to publish corrective statements sufficient to counteract the effects of the harm;

6.    Awarding punitive and exemplary damages in favor of Plaintiffs and against Defendants in amounts to be determined at trial;

7.    Awarding Plaintiffs pre-judgment and post-judgment interest, attorneys' fees and costs, and other expenses incurred in this action;

8.    Granting all other such relief that is available, including by statute or common law, law or equity, to which Plaintiffs may be entitled; and

9.    Granting Plaintiffs such other further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial for all issues triable.

-45-
COMPLAINT AND DEMAND FOR JURY TRIAL

DATED: March 17, 2026                    Respectfully submitted,


By */s/ Kevin Johnson*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Kevin P.B. Johnson (Bar No. 177129)
  kevinjohnson@quinnemanuel.com
  Todd M. Briggs (Bar No. 209282)
  toddbriggs@quinnemanuel.com
  Andrew Bramhall (Bar No. 253115)
  andrewbramhall@quinnemanuel.com
  Brett Arnold (Bar No. 266740)
  brettarnold@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100


*Attorneys for Plaintiffs* TESSELL, INC., BALA
KUCHIBHOTLA, KAMALDEEP KHANUJA,
*and* BAKUL BANTHIA.

13895-00001/17487918.18

-46-
COMPLAINT AND DEMAND FOR JURY TRIAL